**David McCLARY, Plaintiff,**

**v.**

**Walter R. KELLY, Albert Hall, Phillip Coombe, Acting Commissioner for Department of Corrections, Defendants.**

**No. 90–CV–0501A.**

United States District Court,
W.D. New York.

April 30, 1998.

Joseph Gerken, Buffalo, NY, for David McClary, Plaintiff.

Carmen L. Snell, Office of the State Attorney General, Buffalo, NY, Emil J. Bove, Office of New York State Attorney General, Rochester, NY, for Defendants.

## DECISION AND ORDER

FELDMAN, United States Magistrate Judge.

### I. BACKGROUND

Plaintiff David McClary ("McClary") is a state prisoner in the custody of the New York State Department of Corrections. This action, commenced pursuant to 42 U.S.C. § 1983, arises as a result of McClary's uninterrupted confinement in the Special Housing Unit ("SHU") for the period of time from November 20, 1989 through March 12, 1994. McClary's confinement in SHU was not based on any misbehavior while incarcerated, but rather was "administrative segregation", predicated on a determination by prison officials that "the inmate's presence in the general population would pose a threat to the safety and security of the facility." *See* 7 N.Y.C.R.R. § 301.4(b).

McClary commenced this action on May 20, 1990 while he was incarcerated in the Attica Correctional Facility. However, his continual confinement in SHU lasted in excess of four years and occurred in three different prison facilities (Attica, Southport and Wende). He was eventually released from administrative segregation shortly after being transferred from Wende to Shawangunk Correctional Facility on March 12, 1994. By Decision and Order entered January 21, 1997, and pursuant to Rule 15(d) of the Federal Rules of Civil Procedure, McClary's motion to file a supplemental complaint to include his administrative confinement in Southport and Wende was granted. (Docket # 64).

The crux of the constitutional violation alleged in both the original and supplemental complaint is the same—that the failure of the defendants to provide any meaningful review of their determination to place McClary in "administrative segregation" violated his constitutional right to due process. McClary seeks both damages and declaratory relief.

## II. *THE "NEW" DUE PROCESS ANALYSIS*

The Due Process Clause of the Fourteenth Amendment protects individuals from deprivations of "life, liberty or property" without due process. Liberty interests entitled to due process protection arise from either the due process clause itself or from state law. *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). As to the latter source of due process protection, the Supreme Court had, in the past, instructed courts to examine whether the particular state law or regulation at issue contained "language of an unmistakably mandatory character requiring that certain procedures 'shall' 'will' or 'must' be employed" before a deprivation may occur. *Id.* at 471–472, 103 S.Ct. 864. If the statute or regulation used such mandatory language, then the state had created a protected liberty interest that could not be infringed absent due process. *See e.g., Russell v. Coughlin,* 910 F.2d 75, 77

(2d Cir.1990) (New York regulations created liberty interest in remaining free from administrative confinement).

During the pendency of this case, the Supreme Court abandoned the "mandatory language" analysis set forth in *Hewitt.* In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) the Court found that, in the context of prison regulations, *Hewitt's* "mandatory language" formula drove courts to digress from "the real concerns undergirding the liberty protected by the Due Process Clause." *Id.* at 483, 115 S.Ct. 2293. "By shifting the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation, the Court encouraged prisoners to comb regulations in search of mandatory language on which to base entitlement to various state conferred privileges." *Id.* at 481, 115 S.Ct. 2293. The *Sandin* Court found *Hewitt* to have produced two undesirable results: (1) States were reluctant to codify prison management procedures for fear they would be creating protected liberty interests for inmates and (2) courts were forced to squander valuable judicial resources by becoming involved in the day to day management of prisons.

Disavowing the *Hewitt* analysis, the majority in *Sandin* decided to refocus the test of when prison regulations create protected liberty interests for inmates. The Supreme Court held:

> States may in certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will generally be limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless *impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*

*Sandin, supra* at 474, 115 S.Ct. 2293. (emphasis supplied).[1] Thus, to prevail on a due process claim in this post-*Sandin* era, an

---

1. Sandin applies retroactively to McClary's due process claims. *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

inmate must establish both that the confinement or restraint creates an "atypical and significant hardship in relation to ordinary incidents of prison life" *and* that the state has, by regulation or statute, granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

With respect to the first prong, that is whether the conditions of confinement were "atypical and significant", the Second Circuit has expressed the view that fact-finding will ordinarily be necessary. *Sealey v. Giltner,* 116 F.3d 47, 52 (2d Cir.1997) ("[I]n a series of decisions ... we have indicated the desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement"). While the need for fact-finding may be apparent, the parameters of *Sandin* fact-finding hearings are far from settled. Indeed, within the last month, the Second Circuit has resolved two difficult legal issues that divided the parties during the fact-finding hearing held in this case.

### ■ 1. *Sandin's Applicability to Non–Disciplinary Segregation:*

At issue in *Sandin* was the procedural due process rights of an inmate placed in segregation for disciplinary or punitive reasons. The Supreme Court concluded that the *disciplinary* confinement of an inmate for thirty days "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Sandin v. Conner,* 515 U.S. at 474, 115 S.Ct. 2293. (emphasis supplied). In so holding, the *Sandin* majority noted that the conditions found in disciplinary confinement "mirrored those conditions imposed upon inmates in administrative segregation and protective custody" and therefore the confinement was not "atypical" in relation to the "ordinary" or expected incidents of prison life. *Id* at 486, 115 S.Ct. 2293.

The Court's specific reference to administrative segregation as "typical" of what can normally be expected as an incident of prison life prompted some courts to question whether administrative or non-disciplinary segregation could *ever* be deemed "atypical."

Every state must have somewhere in its prison system single-person cells in which prisoners are sometimes confined not because they have misbehaved but simply because the prison has no other space, wishes to protect some prisoners from others, wishes to keep prisoners isolated from one another in order to minimize the risk of riots or other disturbances, wishes to prevent the spread of disease, and so forth. Almost 6 percent of the nation's prison inmates are in segregation (citation omitted) and it appears that the great majority of these are not in disciplinary segregation (citations omitted); so even a prisoner who had committed a white-collar crime and had been assigned to the lowest security prison in the state's system might find himself in segregation for a nondisciplinary reason. (citation omitted). Under *Sandin* this possibility is probably enough to prevent him from complaining successfully of a deprivation of liberty if he is transferred into segregation for a disciplinary infraction.

*Wagner v. Hanks,* 128 F.3d 1173, 1176 (7th Cir.1997). *See Griffin v. Vaughn,* 112 F.3d 703, 706–708 (3rd Cir.1997) (15 month confinement in administrative custody did not deprive inmate of a liberty interest under *Sandin* ); *Pichardo v. Kinker,* 73 F.3d 612, 613 (5th Cir.1996) (administrative segregation, without more, simply does not constitute deprivation of a protected liberty interest under *Sandin* ). *See also Rosario v. Selsky,* 1995 WL 764178 (S.D.N.Y.) ("[u]nder *Sandin,* there is no 'atypical and significant hardship' in disciplinary confinement if inmates placed in the SHU for non-disciplinary reasons are subject to comparable restrictions").

On March 18, 1998, the Second Circuit resolved the issue of whether *Sandin* controlled situations where hardships are imposed on inmates for *non-disciplinary* reasons. In *Arce v. Walker,* 139 F.3d 329 (2d Cir.1998), the inmate-plaintiff ("Arce") was temporarily confined in administrative segregation for a total of 18 days. During this brief period Arce claimed that the defendants deprived him of access to communal religious services, restricted his right to daily out of cell exercise and subjected him to

"verbal harassment." The district court granted summary judgment on the basis that Arce failed to demonstrate that 18 days in administrative segregation amounted to an "atypical and significant" deprivation so as to implicate a protected liberty interest under *Sandin.* *See Arce v. Walker,* 907 F.Supp. 658 (W.D.N.Y.1995).

On appeal, Arce contended that *Sandin* was meant to apply only to claims challenging the conditions of *punitive* or *disciplinary* segregation and had no place in evaluating the due process rights of inmates confined in *administrative* segregation. The Second Circuit disagreed, finding Arce's argument "meritless". *Arce v. Walker,* 139 F.3d 329 (2d Cir.). The Court noted that nothing in *Sandin* indicated that the Supreme Court intended to limit the new due process analysis to restrictions imposed on inmates for punitive as opposed to administrative purposes and thus declined to create such "a novel distinction." *Id.* at 334–45. *See also Powell v. Scully,* 1996 WL 145962 (S.D.N.Y.) (no reason why administrative segregation should not be considered as a less "atypical," less "significant" deprivation than disciplinary confinement).

The *Arce* decision makes both legal and practical sense. At its core, *Sandin* instructs courts to look at the nature and extent of the particular deprivation in deciding whether a protected liberty interest is implicated. Thus, it is the *nature* of the deprivation and not the *reason* for the deprivation that is central to the *Sandin* analysis. Of course, as *Sandin* makes clear, certain deprivations are a typical part of the normal incidents of prison life. In making a determination as to what is an "ordinary incident of prison life," it makes both legal and logical sense to take into account whether particular punitive deprivations are also found in non-punitive forms of prison confinement, such as administrative segregation or protective custody. But it makes little sense to hinge an individual's right to due process simply on the label prison officials choose to attach as the basis for the deprivation. *See McKinnon v. Patterson,* 568 F.2d 930, 937 (2d Cir.1977) ("differences in nomenclature among the various forms of punitive (or disciplinary) confinement should not be dispositive in determining whether minimal due process is required"), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Indeed, one of the reasons the Supreme Court rejected the "mandatory language" analysis of *Hewitt* was because it had the "undesirable effect" of discouraging States from codifying prison management procedures to avoid creating "liberty" interests thereby "conferring standardless discretion on correctional personnel." *Sandin,* 515 U.S. at 482, 115 S.Ct. 2293. Similarly, a due process analysis that would allow correctional personnel to avoid the creation of "liberty interests" by simply assigning misbehaving inmates to a segregated confinement unit for "administrative" (as opposed to "disciplinary") reasons seems to encourage the same "standardless discretion" which the Supreme Court found offensive in *Sandin.* In the present case, there is no dispute that McClary spent over four uninterrupted years in conditions of confinement virtually identical to those found in disciplinary segregation. Whatever his due process rights may be, they should not be extinguishable simply by virtue of the fact that the confinement was labeled by prison officials as "administrative."

**2. *In Applying Sandin, Should the Court Look at the Potential Penalty or the Actual Penalty Imposed?*** To establish a protectable liberty interest under *Sandin,* the inmate must establish that the given restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483, 115 S.Ct. 2293. The Second Circuit has recently stressed the importance of considering the length of the restrictive confinement in deciding whether the hardships imposed were "atypical and significant." *Wright v. Coughlin,* 132 F.3d 133, (2d Cir.1998) (summary judgment vacated and case remanded for failure of district court to consider duration of confinement); *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997) (same).

Procedural due process is not a constitutional right amenable to hindsight. By shifting the focus of a due process analysis solely from whether state prison regulations created a "liberty interest" to a case by case

critique of the specific hardships imposed on the inmate, *Sandin* spawned a difficult issue for courts, prison officials and inmates: Is an inmate's right to procedural due process measured by the *potential* time the inmate could spend in restrictive confinement or the time *actually* spent in restrictive confinement?

In *Sandin*, the maximum allowable sentence the inmate faced (30 days in SHU) was also the punishment meted out by the prison officials. This relatively minor punishment stands in contrast to situations where the punishment (time in SHU) is limited only by the total time left in the inmate's sentence. In a pre-*Sandin* decision, the Second Circuit held that it was the *potential* penalty that triggered an inmate's right to procedural due process. *McKinnon v. Patterson*, 568 F.2d 930, 939 (2d Cir.1977) ("To be workable, the procedural requirements . . . under the due process clause must depend upon the maximum penalty that may be imposed and not upon some lesser penalty that is imposed in any particular case"), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978).

Until recently, district courts within our circuit found themselves at odds over whether the logic of *McKinnon* was equally applicable in post-*Sandin* cases. Some courts adopted the *McKinnon* approach, reasoning that if it was only the time the inmate actually spent in SHU that triggered a protectable liberty interest, prison officials and inmates alike would never know when an inmate is entitled to a hearing with procedural due process safeguards. *See e.g. Justice v. Coughlin*, 941 F.Supp. 1312, 1323 (N.D.N.Y. 1996) (Pooler, J.) (using potential penalty provides a "workable framework for correction officials" and is "consistent with *Sandin*"); *Campo v. Keane*, 913 F.Supp. 814, 821 (S.D.N.Y.1996) (noting "the recognized Second Circuit principle that due process rights must be determined with respect to the *potential* penalty") (emphasis supplied). Other courts rejected the potential penalty theory, reasoning that it is inconsistent with the case by case due process analysis man-

dated by *Sandin. See e.g. Marino v. Klages*, 973 F.Supp. 275, 278 (N.D.N.Y.1997) (in light of *Sandin*'s reasoning which limits due process protection to those cases where a certain degree of hardship is imposed, "application of the 'potential penalty' approach would be an unwarranted extension of this limitation"); *Ruiz v. Selsky*, 1997 WL 137448, *6 (S.D.N.Y.) (potential penalty approach "makes no sense"); *Cespedes v. Coughlin*, 956 F.Supp. 454, 471–72 (S.D.N.Y.1997) ("Court finds nothing in *Sandin* which would suggest that courts should employ the potential penalty approach"); *Morris v. Dann*, 1996 WL 732559, *4 (N.D.N.Y.) (potential penalty approach "is contrary to *Sandin*, which stands for the proposition that each case should be examined individually").

The Second Circuit recently resolved this issue in *Scott v. Albury*, 138 F.3d 474 (2d Cir.1998). While acknowledging that the Circuit's pre-*Sandin* precedent required consideration of the *potential* punishment in determining whether a liberty interest was implicated, the Court held that "*Sandin* is to the contrary and we follow it". *Id.* at 478. As to the argument that only the potential penalty approach would guide prison officials on when to afford an inmate procedural due process, the Court reasoned:

> [S]ome district courts have argued that it is unworkable for states to determine whether a liberty interest has been created based on actual punishment, because states would not know in advance of the sentence whether certain procedural requirements apply in a particular case. (citation omitted). Maybe, but one assumes that states will take the precaution of providing the required level of due process to every inmate who realistically faces a punishment that is atypical under *Sandin*, a precaution that would render the actual punishment rule perfectly workable.

*Id.* at 478.[2]

■ **3. What are the Ordinary Incidents of Prison Life?:** An issue that has yet

---

**2.** The "actual" versus "potential" punishment debate, resolved by *Scott*, had peculiar significance in the context of administrative segregation. Unlike disciplinary confinement in SHU

where an inmate is sentenced to a particular term of punitive restrictions, administrative confinement is for an indeterminate period of time, limited only by (1) the state's determination that

to be addressed by the Second Circuit is what point of comparison should a court use in determining whether particular conditions of confinement would work an atypical and significant deprivation of the inmate's liberty? New York, like all other states, operates prisons with varying security classifications. Are the ordinary and typical incidents of prison life found in a minimum security prison, a medium security prison, or a maximum security prison? Does the answer to the foregoing question depend on the particular security classification assigned to the inmate at the time the alleged deprivation occurs? Should the court, in determining whether a deprivation "of substance" has occurred, compare conditions in disciplinary segregation with those found in general population in the prison in which the particular plaintiff/inmate is confined or those found in the general population of any prison in the entire state?

At least one Circuit has held that the proper comparison under *Sandin* is between the specific deprivations imposed on the plaintiff/inmate and the deprivations found in the most restrictive type of *non-disciplinary* confinement found in any prison in the entire state. *Wagner v. Hanks,* 128 F.3d 1173, 1175 (7th Cir.1997) ("We do not think that comparison can be limited to conditions in the same prison, unless it's the state's most secure one"). In reaching this conclusion, the *Wagner* court relied on the Supreme Court's pre-*Sandin* prison transfer cases which held that the "transfer of a prisoner from one prison to another is not actionable as a deprivation of constitutionally protected liberty *even if the conditions of confinement are much more restrictive in the prison to which the prisoner is being transferred."* *Id.* at 1175. (emphasis supplied). The result of the Seventh Circuit's holding is a recognition that *any* term of disciplinary confinement is not actionable as a due process violation if the conditions of confinement imposed on the inmate are no more onerous than conditions

found in non-disciplinary confinement anywhere in the state's prison system. "[W]hen the entire sanction is confinement in disciplinary segregation for a period that does not exceed the remaining term of the prisoner's incarceration, it is difficult to see how after *Sandin* it can be made the basis of a suit complaining about a deprivation of liberty." *Id.* at 1176.

As indicated, the Second Circuit has not faced this issue directly, but it has, as the *Wagner* court noted, left "the door open a bit wider" than the Seventh Circuit believes *Sandin* permits. For example, in *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997) the Second Circuit reversed and remanded for fact-finding a district court ruling that, as a matter of law, the imposition of segregated confinement for 180 days did not create a hardship that was atypical and significant compared with the ordinary incidents of prison life and therefore involved no actionable deprivation of liberty. The Court held: "[W]e now state explicitly: *Sandin* did not create a *per se* blanket rule that disciplinary confinement may never implicate a liberty interest." *Id.* at 9. The clear import of *Miller* is that conditions of confinement imposed by disciplinary confinement may, in some circumstances, implicate a protected liberty interest notwithstanding the fact that there may be inmates in non-disciplinary confinement who are subjected to identical deprivations. Hence, it seems doubtful that the Second Circuit would hold, as the Seventh Circuit did in *Wagner,* that so long as there exists some form of non-disciplinary segregation in some prison in the State of New York whose conditions of confinement mirror those of which the plaintiff/inmate complains, *Sandin* requires dismissal of the inmate's lawsuit.

Of course, what makes McClary's situation unique to this discussion is that he was never held in disciplinary confinement. The four

---

the inmate no longer needs administrative segregation or (2) the ultimate length of the sentence the inmate is serving. Thus, placement in administrative segregation is always potentially of unlimited duration. Some courts view the limitless potential for segregation as justifying heightened concern for an inmate's due process rights.

*See e.g. Mims v. Shapp,* 744 F.2d 946, 951–52 (3rd Cir.1984) (because placement in administrative segregation is potentially unlimited in duration, inmate invested with significant liberty interest against which adequacy of periodic review procedures must be weighed).

plus years at issue here were spent in administrative segregation, a form of SHU confinement whose conditions and deprivations are, as defendants concede, identical to the conditions and deprivations imposed on inmates found guilty of the most serious disciplinary infractions. At all relevant times, McClary was designated as a maximum security inmate and housed in maximum security correctional facilities. Given the foregoing, I find that the most relevant comparison in determining whether McClary's protected liberty interest has been implicated under *Sandin* is to compare the conditions of McClary's confinement in administrative segregation to the conditions of confinement afforded inmates in general population in maximum security prisons in the State of New York. *See Justice v. Coughlin,* 941 F.Supp. 1312, 1324 (N.D.N.Y.1996) ("[T]he relevant comparison for *Sandin* purposes in New York is between inmates in the SHU for disciplinary purposes and inmates in the general population"). *See also Dawes v. Dibiase,* 1997 WL 376043, *4 (N.D.N.Y.) (court should take into account the "extent to which the alleged loss of liberty portends a departure from the circumstances faced by other 'inmates in the *general population*'") (emphasis supplied) (*quoting Roucchio v. Coughlin,* 923 F.Supp. 360, 372 (E.D.N.Y.1996)).

To summarize: In order to establish a protectable liberty interest under *Sandin*'s new due process analysis, McClary must factually demonstrate that (1) his *actual* term of confinement in administrative segregation created an "*atypical and significant hardship*" in relation to the ordinary incidents of prison life faced by other inmates *in the general population of a maximum security prison* and (2) that New York has, by statute or regulation, granted inmates a protected liberty interest in remaining free from administrative segregation. The burden of proof as to both prongs is squarely on McClary. Finally, whether a prisoner has a protected liberty interest upon which the right to procedural due process may be asserted is a *legal* determination that should be decided by the Court. *See Beverati v. Smith,* 120 F.3d 500, 503 (4th Cir.1997) ("ulti-

mate determination of whether the conditions impose such an atypical and significant hardship that a liberty interest exists is a legal determination").

Having established the legal parameters of McClary's liberty interest, I turn now to whether McClary met his factual burden.

## III. *FINDINGS OF FACT*

Cognizant of the Second Circuit's stated preference for "extensive fact-finding" so as to "identify with specificity" the facts considered by the court in determining whether an inmate's liberty interest has been affected, *see e.g., Sealey v. Giltner,* 116 F.3d 47, 52 (2d Cir.1997) ("we have indicated the desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement"); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) ("extensive fact-finding" by the district court noted by Court of Appeals in affirming dismissal of inmate's action), this Court held a fact-finding hearing to determine whether McClary's years in administrative segregation implicated a protected liberty interest. During extensive hearings conducted between October 29, 1997 and November 5, 1997 the parties presented the testimony of eleven witnesses, including two mental health experts, regarding the circumstances of McClary's confinement in administrative segregation. Post-hearing briefs were submitted by both counsel and the Court had the benefit of reviewing the transcripts of the hearing testimony.[3]

A. *Did McClary's Confinement in Administrative Segregation Create an Atypical and Significant Hardship?* The determination of whether a particular restraint or combination of restraints impose atypical and significant hardships on the prisoner is necessarily a fact specific determination. Relying on *Sandin,* the Second Circuit has identified three relevant factors which courts should evaluate in measuring whether the particular restrictions imposed on the inmate are atypical and significant: (1) the effect of the segregation on the length of prison confinement; (2) the extent to which the condi-

---

**3.** The final transcripts were filed on February 4, 1998. (Docket # 91–93).

tions of the segregation "differ from other routine prison conditions;" and (3) the duration of the segregation imposed. *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). There is no claim here that McClary's prison term was somehow extended by his confinement in administrative segregation. Hence, the core inquiry centers on the *degree and duration* of the hardships imposed by administrative segregation. *See Arce v. Walker,* 139 F.3d 329, 334–35 (*Sandin* "established an analysis under which the degree and duration of an inmate's restraint are the key considerations to determine the existence of a state-created liberty interest"); *Scott v. Albury,* 138 F.3d 474, 478–79 (2d Cir.1998) (in conducting *Sandin* analysis "courts should consider the degree and duration" of the imposed restrictive confinement).

While the parties disagree on the ultimate legal issue of whether McClary had a protected liberty interest to be free from the restraints imposed by administrative segregation, as detailed below, there were surprisingly few factual disputes over either the degree or duration of the restrictions imposed on McClary.

▇ 1. *Degree of Restraints Placed on McClary:* In 1989, David McClary was sentenced to 25 years to life in prison after being convicted of second degree murder. On July 11, 1989 McClary arrived at the Attica Correctional Facility ("Attica"), a maximum security prison. Initially, McClary was placed in general population at Attica. As with other inmates in general population, McClary was given a work assignment (porter), freely interacted with the inmates and staff, participated in group educational, vocational and recreational activities, and ate his meals with other inmates in the prison mess hall. No evidence was presented that McClary presented any disciplinary or security problems while in general population at Attica. (Exhibit 29).

On September 29, 1989 McClary was placed in the custody of the United States Marshal and removed from Attica. McClary remained in federal custody until November 20, 1989 when he was returned to Attica. (Exhibit 29). Immediately upon his return to Attica, McClary was reassigned from general population into administrative segregation. The reasons for the reassignment were not entirely clear from the hearing testimony. Albert Hall, who served as Deputy Superintendent for Security at Attica from 1988 through 1992 testified that McClary had been transported to New York City for "court" and prior to his return to Attica, "the facility was notified [of] certain things that [had] happened during the trial and that we were to be aware of them and to look at placing him in administrative segregation upon his return." (Tr. 91–5)[4] McClary remained in administrative segregation within the Special Housing Unit ("SHU") for the remainder of his incarceration in Attica.

McClary was continuously confined in administrative segregation until March 12, 1994, a total confinement of four years, three months and 19 days.[5] In March 1994 McClary was released into the general population at the Shawangunk Correctional Facility. He has remained in general population since.

Much of the testimony at the fact-finding hearing focused on the nature and degree of restrictions placed upon McClary as a result of being confined in administrative segregation. Although McClary was housed in three different prisons, the evidence adduced at the hearing demonstrated that the essential conditions of confinement experienced by McClary in each of the prisons was, for purposes of *Sandin,* indistinguishable. Given the task of determining whether McClary's confinement in administrative segregation imposed atypical and significant hardships in relation to the ordinary inci-

---

**4.** Reference to the hearing transcript are noted by the docket number followed by the page number. Thus, "Tr. 91–5" refers to the transcript docketed as # 91 at page 5.

**5.** Although his confinement in administrative segregation was uninterrupted, it occurred in four different New York State prisons: Novem-

ber 20, 1989 to July 30, 1990 (Attica Correctional Facility); July 31, 1990 to March 19, 1991 (Southport Correctional Facility); August 1, 1991 to March 12, 1994 (Wende Correctional Facility). McClary remained at Wende until March 12, 1994 when he was transferred to the Shawangunk Correctional Facility.

dents of prison life, a summary of the hearing testimony regarding the restrictions imposed on McClary is appropriate.

*Special Housing Unit:* Throughout the four years he was confined in administrative segregation, McClary was assigned to the Special Housing Unit (SHU). Because the SHU is a highly restrictive, controlled and sparse living environment, most of the inmates housed in the SHU are subjected to its restrictions for punitive purposes. It is, by all accounts, an environment in which most inmates would choose not to be housed and thus is often used as part of a punishment for inmates who violate prison rules or regulations. Frank Irvin, former Superintendent of the Wende Correctional Facility testified that the "vast majority of SHU admissions are for disciplinary reasons" (Tr. 92–138), estimating that of the total SHU population, 95% were for disciplinary reasons. (Tr. 92–196). Irvin described SHU inmates as "the most disruptive, assaultive, dangerous inmates we have in our system". (Tr. 92–184). At Wende, where McClary spent the most time in administrative segregation, there were no procedures used to segregate administrative SHU inmates from disciplinary SHU inmates. (Tr. 92–180).[6]

*Isolation:* Of all the restrictions imposed on McClary by virtue of being assigned to administrative segregation, the isolation associated with SHU confinement was, by far, the most significant and atypical hardship. Inmates in SHU are typically confined to their cell alone for 23 hours each and every day. SHU inmates are permitted one hour of "outdoor exercise" each day. However, unlike general population inmates who have the opportunity to utilize recreational equipment or to engage in organized team sport or exercise, a SHU inmate's ability to "exercise" was severely limited. At Attica, a SHU inmate would be escorted to an "exercise cell" for recreation. According to former Deputy Superintendent Hall, the outdoor exercise cell was approximately the same size as the inmate's SHU cell. McClary described the Attica exercise cells as being four concrete

walls with a "mesh" ceiling. Views of anything other than the sky through the mesh were impossible. No recreational or exercise equipment of any kind is provided to the SHU inmate. The inmate is left alone for the entire hour. According to Hall, regardless of the weather, the SHU inmate may not return inside "unless it were an emergency". (Tr. 91–11). There were no bathrooms in the SHU exercise cells. McClary described the exercise cells as "disgusting," stating that often there were feces and urine in the cells. When it was raining, McClary stated the cells were full of water. Often SHU inmates would refuse their one hour outdoor exercise privilege because of winter weather.

Unlike general population inmates, SHU inmates ate all meals alone in their cells. (Tr. 91–13). While in their cells, SHU inmates can not see each other or have any physical contact with other inmates. All communication between inmates was by yelling from cell to cell. McClary testified that the noise in SHU was "so loud you could not hear yourself think" and mentally disturbed inmates were often awake throughout the night screaming or yelling.

Plexiglass shields were sometimes placed over SHU cells to prevent the inmate occupant from throwing food, urine, feces and saliva at staff or other inmates. (Tr. 91–10, 91–11). According to McClary, SHU inmates would flood their cells with toilet water to "get back" at guards who would, in turn, deliberately delay cleaning up the waste to punish the inmates. SHU cells have no windows (91–14). SHU inmates' access to items of personal property was restricted as compared to inmates in general population. (Tr. 91–58). Commissary purchases were restricted, package privileges were restricted, access to the law library was restricted, and access to showers was restricted. *See generally* 7 N.Y.C.R.R. § 302 *et seq.*

Contact with the outside world was also limited for SHU inmates. For example, general population inmates had unlimited visitation privileges, while SHU inmates were limited to one nonlegal visit per week. (Tr. 91–

---

**6.** At Attica, any effort made to keep inmates confined to SHU for disciplinary reasons separate from inmates assigned to SHU for non-disciplinary reasons were dependent on the availability of cells within the SHU at any particular time. (Tr. 91–8, 90–8).

53, 92–141). General population inmates had no restrictions on telephone privileges. SHU inmates, however, had "totally different" phone privileges and, in fact, could make calls only if they could convince a staff member to allow the inmate to make a call. (Tr. 92–142). Deputy Superintendent Hall testified that at Attica, permission for an SHU inmate to use the phones "may or may not be given", even if the inmate has "good cause" to make a personal call. (Tr. 91–70). Deputy Superintendent Irvin testified that "only emergency telephone calls" were permitted to be made by SHU inmates at Wende. (Tr. 92–142). General Population inmates were eligible to participate in the Family Reunion Program visitation program, SHU inmates were not. (Tr. 91–54). While many of these restrictions seem related to the punitive purposes for which most of SHU inmates are confined, there was no differentiation between "privileges" afforded disciplinary and non-disciplinary inmates housed in SHU.

*Psychological Harm:* McClary's testimony about the hardships and isolation he endured during his four years in SHU included allegations regarding the effect those hardships had on his mental health. When he arrived at Attica in July 1989, McClary related that his adjustment to general population was uneventful. He was assigned a job as a porter, participated in recreational, vocational and educational programs, ate his meals in the mess halls and generally became acclimated to the rigors and restrictions of life in a maximum security prison without incident.

According to McClary, the effect of long-term SHU on his mental health was devastating. As the months and years of isolation continued, McClary became increasingly depressed, withdrawn, afraid and "jumpy." He described himself as slowly becoming "emotionless." He could not comprehend or accept why he was being forced to live in SHU. Prison staff seemed unsympathetic to his desire to challenge his administrative segregation status and refused to give him any hope of release from the SHU. All he was told, according to McClary, was that his stay in SHU was "indefinite." McClary testified that he became preoccupied with being released back into general population and began having "revenge fantasies" which he described as unwanted thoughts of committing violence against those he viewed as responsible for his continued confinement in SHU. His visits with family members and friends deteriorated. He was withdrawn and angry. Family members were unable to understand and he was unable to explain how he could be confined to SHU without having done something wrong.

McClary testified that while incarcerated in the Wende SHU he sought mental health treatment. He was interviewed "three or four" times by a prison psychologist in the prison's infirmity. During each session, guards were with him and their presence made McClary reluctant to confide openly on what he was feeling. McClary claimed the guards who accompanied him to the infirmary "made fun" of what he discussed with the prison psychologist. On one occasion, the prison psychologist asked the guards to leave and they refused for "security reasons."

Dr. Stuart Grassian, a psychiatrist, testified on behalf of McClary. Dr. Grassian is a graduate of Harvard Medical School and maintains a faculty appointment at the medical school along with a private practice in psychiatry. He is board certified in psychiatry and, in addition, has subspecialty certifications in addictions and forensic psychiatry. (Tr. 88–5) Dr. Grassian has lectured, written and testified on the relationship between conditions of prison confinement and the mental health of inmates. He has toured SHU's and interviewed inmates in various New York State Prisons including Attica, Auburn, Southport, Bedford Hills, Shawangunk and Great Meadows. (Tr. 88–45, 88–64). His academic articles on the topic of "psychiatric affects of solitary confinement" have been published in the American Journal of Psychiatry and the International Journal of Law and Psychiatry. (Tr. 88–6). Although Dr. Grassian does not currently provide treatment to inmates as part of his private practice, his patients do include prison guards who are referred to him through the Stress Management Unit of the Correctional Officers Association of New York. (Tr. 88–77). His credentials and experience are further detailed in hearing exhibits 11, 12 and 13.

Dr. Grassian testified at length regarding his research into the "toxicity" of SHU environments. Based on his tours of various SHUs he found several consistent features among the units. The SHU cells were typically small, sparsely furnished. Occasionally, but not usually there would be a window in the SHU cell, but meaningful stimulation with the outside environment was difficult and often impossible. The SHU inmate normally would be confined to his cell 23 hours a day with the remaining hour devoted to outside "exercise." The exercise cells were typically chain link cells or outside concrete cells with no view of the horizon. In addition, SHU inmates would be subjected to an environment of highly restricted social interaction. Communications among SHU inmates were abnormal. SHU areas were typically noisy and the inmates would be limited, for the most part, to non-private shouting from cell to cell. According to Dr. Grassian, the difficulty of normal communication caused many SHU inmates to avoid meaningful conversation altogether. (Tr. 88–48).

Based on his observations and studies, Dr. Grassian found that prolonged confinement in these restrictive environments caused inmates in SHU to experience similar reactions or "symptoms." These symptoms include anxiety disorders, paranoia, perceptual disorders, difficulties in thinking, concentration and memory. (Tr. 88–50). Dr. Grassian found that the primary toxic affect of SHU confinement is "the inability to maintain an adequate state of alertness because of an inadequate amount of external environmental stimulation." (Tr. 88–71). He opined that

as a person loses their capacity to maintain a normal state of alertness and they head towards that stupor, delirium kind of state, they become unable to have a normal attentional process. This results in either obsessional thinking or the kind of fugue, fog, cloud, dissociative sort of state, and both things can happen.

(Tr. 88–57).

Dr. Grassian testified that every inmate confined to SHU "will react to the toxicity of that environment." However, "the extent of the harm will vary, depending on the inmate,

the stringency and the length of the confinement." (Tr. 88–131). Dr. Grassian conceded that not all inmates will react the same way to SHU confinement because the mental health and personality of the inmate prior to SHU confinement (the inmate's "premorbid adjustment") would, to some extent, influence the onset and intensity of adverse reactions to SHU. "The toxic affect [of SHU] produces a range of results, depending on the strength or vulnerability of the individual." (Tr. 88–71). However, he was emphatic that a period of SHU confinement in excess of four years "was beyond anything a human being can tolerate.... A restriction of environmental and social stimulation that is so prolonged is a toxin that you keep feeding into that individual and he's going to get sick." (Tr. 88–74).

After examining and evaluating David McClary,[7] Dr Grassian found that although McClary "tolerated a SHU environment better than the majority of people who face such prolonged confinement" (Tr. 88–55), he did develop mental health problems typical of inmates who are deprived of social and environmental stimulation for prolonged periods. McClary exhibited significant problems with perceptual distortions, illusions and experienced brief periods of an "overt confusional state" of mind. McClary developed sleep disturbances, anxiety and irritability from SHU confinement. McClary had problems with thinking, concentration and memory. At times "his mind would be in a fog or a cloud and he couldn't think and at other times he would become obsessionally fixated on one thing or another." These unwanted obsessional thoughts, referred to as "revenge fantasies", would go on and on in McClary's mind "like a broken record." (Tr. 88–56 to 88–58). Although McClary never became actively psychotic while in SHU, Dr. Grassian found that he did experience "episodes of great confusional state." (Tr. 88–66). Dr. Grassian concluded:

I conclude to a reasonable degree of medical certainty that there is a very substantial likelihood that an inmate experiencing years of confinement in the type of strin-

---

7. Dr. Grassian also interviewed McClary's moth-

er, wife and one of his sisters. (Tr. 88–63).

gent conditions Mr. McClary has experienced since his initial November 1989 confinement in Special Housing Units, in Administrative Segregation status, would suffer severe psychiatric harm, as well as the disruption of family relationships he enjoyed prior to such stringent confinement. Given these facts, I conclude to a reasonable degree of medical certainty that such confinement represents, from a psychiatric viewpoint, a severe and dramatic departure from general prison conditions prevailing in New York State prisons.

Exhibit 11.

Dr. Joel Dvoskin, a psychologist, was called by the defendants and testified at length regarding (1) his opinions as to the findings and conclusions of Dr. Grassian and (2) the mental status of McClary. Dr. Dvoskin holds a doctorate in clinical psychology from the University of Arizona and has previously testified in cases involving the mental health of inmates. He has held a variety of positions with the State of New York which have involved providing mental health services to inmates confined in state prisons, including Director of Forensic Services for the State of New York and Acting Commissioner of the New York State Office of Mental Health. Dr. Dvoskin currently resides in California where he consults in the area of forensic psychology, maintains a private practice and teaches at the University of Arizona. (Tr. 93–6). His credentials, experience and background are more fully set forth in exhibit 410(A).

Dr. Dvoskin and Dr. Grassian are not strangers to each other or federal court. They have been on the opposite sides of several cases involving the provision of mental health services to prison inmates in general and SHU inmates in particular. *See e.g., Langley v. Coughlin,* 715 F.Supp. 522 (S.D.N.Y.1989) (SHU in Bedford Hills); *Eng v. Smith,* 849 F.2d 80 (2d Cir.1988) (SHU in Attica); *Madrid v. Gomez,* 889 F.Supp. 1146 (N.D.Cal.1995) (Pelican Bay State Prison in California); *Coleman v. Wilson,* 912 F.Supp. 1282 (E.D.Cal.1995) (California prisons). Much of Dr. Dvoskin's testimony centered around his apparently long standing objec-

tion to Dr. Grassian's findings with respect to a so-called "syndrome" experienced by inmates subjected to prolonged SHU confinement. According to Dr. Dvoskin, no such "syndrome" exists. Moreover, Dr. Dvoskin claims that Dr. Grassian's research "does not stand up to the most elementary form of scientific scrutiny." (Tr. 93–54). Such a "syndrome," Dr. Dvoskin asserts is "the idiosyncratic idea of Dr. Grassian alone." *Id.* When asked his opinion as to the "psychological effects of Special Housing Unit confinement on inmates," Dr. Dvoskin stated:

> My opinion is that SHU is a stressful place, that people respond to that stress differently. That individuals respond very differently to SHU. Some people can't handle it at all and a few days in SHU, they don't do well; some people handle it very well for long periods of time; and, lots of people handle it well sometimes and not well other times. Just like maximum incarceration generally. My disagreement with Stuart [Grassian] has to do with the overgeneralization and presumptions that miss the individualized approach, which is the best way to do this business.

(Tr. 93–83). Under, Dr. Dvoskin's "individualized approach," if an inmate "can't handle" SHU confinement and became floridly psychotic, he would "say lets get [the inmate] out of here, put him in a treatment bed somewhere and figure out what's going on with this individual and then decide what to do from there." (Tr. 93–104).

Although Dr. Dvoskin eschewed any discrete theory that prolonged confinement in SHU causes a cluster of predictable psychiatric difficulties, much of his testimony was more corroborative than contrary to the testimony of Dr. Grassian. McClary impressed Dr. Dvoskin as being honest and forthright in describing his psychological functioning during the time he was in SHU. (Tr. 93–87). Dr. Dvoskin opined that while incarcerated in Attica, McClary suffered mild to moderate depression, was angry, irritable, anxious and had fantasies of harming correction officers. (Tr. 93–42 to 93–43). He also testified on direct examination that such symptoms, while not uncommon in prison inmates generally, are most prevalent in inmates confined

to SHU. (Tr. 93–43). When he arrived at Wende, Dr. Dvoskin related that McClary's mental health problems worsened and he suffered from severe depression, anxiety, insomnia and eventually had to seek mental health treatment. (Tr. 93–46). While Dr. Dvoskin believed there were multiple stressors causing McClary's psychological problems, "certainly being locked down in SHU was one of those stressors, no question about it." (Tr. 93–47). As a result of those problems, McClary was prescribed a psychotropic antidepressant that also helped reduce his anxiety and insomnia. According to Dr. Dvoskin, stressors typically found in a SHU environment include constant noise, a "stark environment" and "minimal contact between staff and inmates." (Exhibit 39 at pages 4484–4485). Further, Dr. Dvoskin agrees that the stressors associated with SHU segregation may exacerbate pre-existing mental illness. (Exhibit 39 at page 4466).

For purposes of *Sandin*, this Court need not and will not decide whether a specific, independent psychiatric "syndrome" exists with respect to the psychopathological effects of prolonged SHU confinement.[8] A conclusion, however, that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science. "Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances." *Madrid v. Gomez*, 889 F.Supp. 1146, 1230 (N.D.Cal.1995). *See also Davenport v. DeRobertis*, 844 F.2d 1310, 1316 (7th Cir.) (noting that there is "plenty of medical and psychological literature concerning the ill effects" of segregation of prison inmates), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *Morris v. Travisono*, 549 F.Supp. 291, 295 (D.R.I.

1982) ("Judicial review of prison officials' justification for holding a prisoner in solitary confinement for an extended period of time is necessitated by the debilitating effect such confinement can have on a prisoner"), *aff'd*, 707 F.2d 28 (1st Cir.1983); *Ruiz v. Estelle*, 503 F.Supp. 1265, 1360 (S.D.Tex.1980) ("In addition to causing physical deterioration, the conditions of solitary confinement occasioned severely negative and pernicious psychological effects on some inmates"); *Kelly v. Brewer*, 378 F.Supp. 447, 451 (S.D.Iowa 1974) (Court relies on opinion testimony of psychologist who found that administrative segregation "and the sensory deprivation resulting from such confinement can have extremely harmful psychological effects upon the person involved"); *Landman v. Royster*, 354 F.Supp. 1302, 1307 (E.D.Va.1973) (Court relied on opinion testimony of psychiatrist who found that "solitary confinement beyond a two or three week period would have a definite adverse effect upon most people").

In the final analysis, the ongoing debate between Drs. Grassian and Dvoskin, while interesting, is really tangential to the liberty interest issue before this court. Even Dr. Dvoskin agreed that (1) psychological stressors typically present in a maximum security prison are "more intense" in SHU, (Tr. 93–201); (2) the more restrictions and isolation you impose on an inmate the more psychologically stressful his environment becomes (Tr. 93–201, 93–202) and (3) the longer an inmate spends in SHU, the more likely it is that the inmate will have "difficulty dealing with it." (Tr. 93–202). Whatever the measuring stick, a plaintiff need not show that every inmate confined to SHU suffers from mental illness as a result of such placement to demonstrate an "atypical" hardship. For *Sandin* purposes, it will suffice if the risk of psychological harm is increased by placing an inmate in SHU for prolonged periods. If such is the case, than the *increased risk* is

---

8. For this reason, defendants' *Daubert* motion to exclude that portion of Dr. Grassian's testimony about "a so called syndrome" concerning the "Psychopathological Effects of Solitary Confinement" (Docket # 84) is denied. Whether or not an exact or medically discrete syndrome exists is of no consequence to the Court's present limited task of defining the parameters of McClary's liberty interest in remaining free from administra-

tive segregation. *See Madrid v. Gomez*, 889 F.Supp. 1146, 1231–32 (N.D.Cal.1995) ("Regardless of whether there is an 'exact syndrome' associated with incarceration in solitary confinement or security housing units, the Court is well satisfied that a severe reduction in environmental stimulation and social isolation can have serious psychiatric consequences for some people").

simply another significant and atypical hardship that inmates confined to SHU face which inmates in general population do not.

*Programming:* General Population inmates had a variety of vocational, rehabilitative and educational opportunities available. For example, testimony indicated that the prison facilities offered substance abuse programs and alternative to violence programs in which SHU inmates could not participate. General population inmates had job assignments and were entitled to varying degrees of pay. (Tr. 90–39). SHU inmates were not permitted to work within the prison and were limited to "idle pay." (Tr. 90–39). SHU inmates, such as McClary, were not permitted to attend congregate religious services. (Tr. 92–158). General population inmates were permitted to attend various group educational programs with live faculty. SHU inmates were limited to "cell-study." Inmates in general population interacted with each other and prison staff on a regular and daily basis. Former Deputy Superintendent Hall estimated that inmates in general population were outside of their cells for at least half the day in order to engage in congregate meals, vocational programs, educational programs, recreational programs, congregate religious programs or, when eligible, family reunion programs.

In sum, based on the testimony adduced at the hearing, I find the *degree* of restrictions placed on McClary while confined to SHU were both significant and atypical within the meaning of *Sandin.*[9]

2. *Duration of Restraints placed on McClary:* In its post-*Sandin* decisions, the Second Circuit has emphasized that in determining whether particular restraints impose atypical and significant hardships, the duration of the confinement is a "critical factor in the *Sandin* analysis." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). *See also Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir. 1997) (summary judgment for defendants vacated for failure of district court to consider the duration of the restrictions placed on inmate). Furthermore, the level of hardships imposed on an inmate can be "offset by the relative brevity" of the segregated confinement. *Arce v. Walker,* 139 F.3d 329, 337 (2d Cir.) (hardship caused by 18 days in SHU's administrative segregation offset by the "relative brevity" of the confinement). *See also Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (12 days of pre-hearing confinement in SHU did not implicate state created liberty interest). Thus, in deciding whether a deprivation imposed an atypical and significant hardship on a prisoner, this Court must balance the nature and severity of the deprivations with the duration of those deprivations.

By stipulation, the parties offered into evidence various statistics kept by DOCS regarding New York prison populations and disciplinary confinement during various time periods. (Exhibit 19). Those statistics make clear, and McClary does not dispute, that confinement in SHU for some period of time is not a rare occurrence in the state prison system. For example, in 1993, DOCS had 97,537 inmates in their custody at some point during the year. During 1993, 4,604 inmates were disciplined and, as part of their punishment, received a term of SHU confinement. However, of those 4,604 inmates who were disciplined, only 15 inmates (approximately one third of one percent) were sentenced to over 3 years confinement in SHU. Thus, while confinement in SHU as a punishment for misbehavior is not a rare occurrence in New York prisons, punitive confinement for

---

**9.** At the hearing, the defendants did not dispute the existence or degree of many of the restraints placed on inmates housed in SHU, including McClary. Instead, they argued that because the "general conditions of SHU" confinement are prescribed by official regulations and directives, such living conditions are "part and parcel of the prison regime to be normally expected by one serving a sentence in [the New York state prison] system". *See* Defendants' Post-trial Memorandum, Docket #87 at page 26–27. I disagree. While defendants' compliance with state regulations and guidelines regarding prison conditions and permissible punishment for institutional misbehavior may be relevant, such compliance does not, in and of itself, define an inmate's constitutional right to procedural due process. Indeed, nothing in *Sandin* suggests that an inmate must sustain an Eighth Amendment violation in order to establish an "atypical and significant hardship." *See Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir.1996) ("We do not suggest, however, that the new [*Sandin*] test is synonymous with Eighth Amendment violation").

over 3 years clearly is. DOCS did not keep statistics as to the number or duration of SHU confinement for administrative purposes, but it is not difficult to extrapolate that it is a rare occurrence. Selsky testified that during the relevant time period, there were only about 50 to 75 inmates in the entire New York state prison system confined in SHU for administrative segregation. (Tr. 90–160). Selsky also testified he could only recall "a couple of inmates— a few inmates who have served long term administrative segregation." (Tr. 90–161). Selsky could name only two (Blake and Tackman) and, unlike McClary, both of them had escape risks associated with either their crimes or their confinement. (Tr. 90–161 to 90–164). Other witnesses supported the finding that while administrative segregation is rare, long term administrative confinement is even rarer. Paul Mecca, employed by DOCS as a correctional counselor for 13 years, testified that he had never encountered an inmate who had been confined to administrative segregation for three years. (Tr. 92–97). Frank Irvin, a long-time DOCS employee and former Deputy Superintendent of Wende testified he could only recall one inmate who had been in administrative segregation for longer than four years. (Tr. 92–174). Albert Hall, the former Deputy Superintendent for Security at Attica, testified that he could not recall any inmate at Attica who had been continuously confined in administrative segregation for more than two years. (Tr. 91–27).

Thus, I conclude that four years, three months and 19 days in SHU for administrative segregation is an atypical and significant hardship in relation to the ordinary incidents of prison life. Perhaps recognizing the inev-

itability of such a conclusion, defendants contend that although McClary's assignment to administrative segregation was continuous, McClary's confinement at each of the three prisons (Attica, Southport and Wende) must be considered separately "for the purpose of deciding if plaintiff had a liberty interest in avoiding the confinement imposed at each facility." *See* Defendants' Post Trial Memorandum, Docket # 87 at page 20. Relying on the regulations which set forth the procedures to be followed when an inmate is placed in administrative segregation, *see* 7 N.Y.C.R.R § 301.4, defendants contend that because the decision to place an inmate in administrative segregation is made at the individual prison facility, the court must segment each period of segregation for purposes of determining whether a protected liberty interest is implicated. Under the defendants' theory, despite the fact that McClary spent over four uninterrupted years in SHU, the court must divide the time into three legally distinct periods: Attica (approximately eight months in administrative segregation), Southport (approximately eight months in administrative segregation) and Wende (approximately three years in administrative segregation).

The Court declines to decide this issue because even assuming the defendants to be correct, based on the evidence presented at the hearing, I find that the degree and duration of restrictions at each prison, considered separately, imposed atypical and significant hardships on McClary. *See Sealey v. Giltner,* 116 F.3d 47, 51, 52 (2d Cir.1997) (summary judgment vacated and fact-finding hearing directed where inmate faced an indefinite term in administrative segregation and actually served 152 days).[10]

10. If I were to decide this issue, the defendants' position is precarious. While separating the time McClary spent in administrative segregation into distinct time periods might logically be appropriate for determining damages, it seems far less pertinent in determining whether McClary's liberty interest was implicated. His confinement to SHU was continuous and uninterrupted. There was no evidence presented that McClary had any control over which prison he was to be incarcerated. Significantly, there *was* evidence that in McClary's case, the decision to place and keep McClary in administrative segregation was not, as the defendants claim, made independently

by each prison facility. Exhibit 1 is a memorandum dated September 30, 1989 (almost two months before McClary was returned by the federal marshal to Attica) clearly indicating that Attica officials were being directed by Deputy DOCS Commissioner Goord to place McClary in administrative segregation. Former Deputy Superintendent Hall testified that the decision to place McClary in administrative segregation was not made by Attica, but rather was mandated by Central Command. (Tr. 91–29). In addition, Frank Irvin, who was the Superintendent of Wende when McClary was confined there testified that he had "no discretion" in placing

*Conclusion:* The foregoing pays tribute to the fact that determining what is "atypical" in relation to "ordinary" incidents of prison life is not a task amenable to bright line rules or litmus test results. The varying penological purposes incarceration serves and the nature of prison life itself simply do not lend themselves to fixed categorical boundaries of what is "typical" or what is "ordinary." Nonetheless, defense witness Donald Selsky, who has been the Director of Special Housing Units and Inmate Disciplinary Programs for the New York State Department of Corrections for the past ten years, defined "general population" as the *"normal living status of inmates "* in New York State prisons. (Tr. 90–126) (emphasis added). The hearing testimony detailed the myriad of differences between the degree of restrictions and restraints placed on SHU inmates and those placed on inmates in the general population. Well respected experts helped define how prolonged SHU confinement may impact the mental health of inmates. Finally, and perhaps most significantly, the proof demonstrated how the *length* of McClary's confinement and the particular hardships he endured in prolonged administrative segregation were atypical and significant.

Based on the foregoing there can be no doubt that at some point in time, the degree, duration and nature of hardships imposed by virtue of continuous confinement in SHU becomes atypical and unusual in relation to "ordinary" prison life. That point in time was met with respect to David McClary.

■ B. *Has New York, by Statute or Regulation, Granted Inmates a Protected Liberty Interest in Remaining Free from Administrative Segregation?* Having found that McClary's liberty interest in being free from the hardships of administrative segre-

gation is an interest of "real substance," *Sandin,* 515 U.S. at 480, 115 S.Ct. 2293, the Court now turns to whether New York "has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that [type of] confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).[11]

This prong of the *Sandin* test has been satisfied. New York has promulgated detailed and substantive regulations concerning an inmate's right to due process when being placed in SHU due to administrative segregation. The regulations provide that the inmate is entitled to a due process hearing which *"shall* be conducted within 14 days of an inmate's admission to administrative segregation." 7 N.Y.C.R.R. § 301.4. (emphasis added). The regulations further provide that "[i]nmates assigned to administrative segregation status *shall* have such status reviewed every seven days for the first two months, and every 30 days thereafter" by a three member committee, whose recommendation *"shall* be forwarded, in writing, to the superintendent for final determination." *Id.* (emphasis supplied). The hearing decision must "set forth *specific reasons why administrative segregation is warranted." Id.* (emphasis supplied). The regulations also provide that the procedures to be followed in administrative segregation due process hearings are the same procedures that are used when assigning an inmate to SHU for disciplinary reasons. *See* 7 N.Y.C.R.R. § 254 *et seq.* Donald Selsky, DOC's Director of Special Housing Units, testified that the procedures set forth in the regulations are not optional, but mandatory for all inmates who are to be placed in administrative segregation. (Tr. 90–189, 90–190). Albert Hall, former chairman of the administrative segregation com-

---

McClary in administrative segregation. Irvin recalled that the order to place McClary in SHU "came from the Inspector General's Office". (Tr. 92–201). It seems apparent that in McClary's case there was evidence of, at the very least, "system-wide" decision making.

**11.** I reject McClary's claim that his long term administrative confinement in SHU was so " 'qualitatively different' from the punishment characteristically suffered by a person convicted of a crime" that such confinement, by itself,

implicates the Due Process Clause. *Sandin,* 515 U.S. at 479 n. 4, 115 S.Ct. 2293. *See Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("The due process clause itself does not confer on inmates a liberty interest in being confined in the general prison population, rather than the more restrictive administrative segregation"); *Castaneda v. Marshall,* 1997 WL 123253 (N.D.Cal.) (same); *Morris v. Dann,* 1996 WL 732559 (N.D.N.Y.) (same); *Rosario v. Selsky,* 1995 WL 764178 (S.D.N.Y.) (same).

mittee at Attica (Tr. 91–22, 92–23), former Wende Superintendent Frank Irvin (Tr. 92–120) and current Attica Superintendent Walter Kelly all agreed that the due process procedures were mandatory.

Prior to *Sandin,* the law in the Second Circuit was clear that these regulations created a liberty interest in remaining free from administrative confinement. *Gittens v. Lefevre,* 891 F.2d 38, 40 (2d Cir.1989); *Russell v. Coughlin,* 910 F.2d 75, 77 (2d Cir.1990). The new due process analysis enunciated in *Sandin* does not alter these decisions. While *Sandin* limits due process protection to hardships that are "of real substance," as Justice Breyer points out in his dissent, the *Sandin* decision also expressly "reaffirms that the 'liberty' protected by the Fourteenth Amendment includes interests that state law may create." *Sandin,* 515 U.S. at 501, 115 S.Ct. 2293. (Breyer, J. dissenting). The regulations at issue here (1) concern the imposition of a hardship of real substance, (2) restrict the power of prison officials to impose that hardship to instances where a defined and specific factual standard has been met (i.e., where the inmate's presence in general population "poses a threat to the safety and security" of the prison) and (3) sets forth a detailed and mandatory due process procedure for determining whether or not an inmate meets the substantive standard necessary for imposition of the hardship. Based on the foregoing, I conclude that the State has, by regulation, granted inmates confined within its prisons a protected liberty interest in remaining free from long-term administrative segregation. *See Tellier v. Scott,* 1998 WL 65983 (S.D.N.Y.); *Castaneda v. Marshall,* 1997 WL 123253 (N.D.Cal.). *See also Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir. 1997) ("we have never held that New York prisoners have no liberty interest in avoiding long-term administrative confinement").

## IV.  *ELEMENTS OF DUE PROCESS*

■ Having found that (1) McClary's prolonged confinement in administrative segregation created an atypical and significant hardship within the meaning of *Sandin* and (2) that New York has by regulation granted inmates a protected liberty interest in remaining free from such confinement, I turn now to what process was due to McClary?

It is well settled that prison administrators must be "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). *See Sandin,* 515 U.S. at 482, 115 S.Ct. 2293. (Federal courts must "afford appropriate deference and flexibility to state officials trying to manage a volatile [prison] environment"). Accordingly, the decision to place an inmate in administrative segregation is "subject to limited procedural safeguards." *Brown v. Plaut,* 131 F.3d 163, 170 (D.C.Cir.1997). *See Wolff v. McDonnell,* 418 U.S. 539, 560, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (one cannot automatically apply procedural rules designed for free citizens to the "very different situation" of segregation proceedings in state prisons). While *Sandin* "modified the analysis under which federal courts determine whether state law confers a liberty interest on inmates," *Arce v. Walker,* 139 F.3d 329, 334, the decision did not revamp the requirements of due process once a liberty interest has been implicated. Thus, pre-*Sandin* precedent controls as to what process is due an inmate who is confined to administrative segregation.

In *Hewitt v. Helms,* 459 U.S. 460, 476, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) the Supreme Court defined the procedural due process to which an inmate is entitled when placed in administrative segregation. The Court held that "an informal, nonadversary review," occurring within a "reasonable time following the inmate's transfer," *id.* at 476, 103 S.Ct. 864, where the inmate "receive[s] some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation" is sufficient due process under the circumstances. *Id.* at 460. In addition, prison officials must engage in "periodic review" of the decision to place an inmate in administrative segregation to ascertain "whether a prisoner remains a security risk." *Id.* at 477 n. 9. Finally, "administrative segregation may not

be used as a pretext for indefinite confinement" of an inmate in segregated housing. *Id.* Thus, a decision by prison officials to keep an inmate in segregation must be supported by "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 447, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). Due process is not satisfied where the periodic reviews are a sham; the reviews must be meaningful and not simply perfunctory. *Giano v. Kelly,* 869 F.Supp. 143, 150–151 (W.D.N.Y.1994). *See also Rhinehart v. Gomez,* 1998 WL 118179, *4 (N.D.Cal.) ("reviews of indeterminate placements in administrative segregation must amount to more than 'meaningless gestures' because of the potentially unlimited span of the confinement").

■ The essential elements of minimal due process required in the prison environment are easily satisfied by the detailed regulations and directives which control the placement of inmates in administrative segregation in New York state prisons. Whether those regulations and directives were followed in a meaningful manner is disputed by the parties. While it is for the Court to determine what process was due McClary, it is for the jury to decide whether he received that process.

### V. *CONCLUSION*

While the proof presented at the fact-finding hearing was wide-ranging, it bears emphasizing that this Court's holding is limited to the particular facts involving David McClary. Based on the evidence presented, the Court finds: (1) the hardships McClary endured while in prolonged administrative segregation were of "real substance" in both degree and duration thus constituting "atypical and significant" hardships within the scope of *Sandin;* (2) New York has, by regulations, granted inmates a protected liberty interest in remaining free from prolonged administrative segregation and (3) those regulations, if followed in a meaningful manner, satisfy the limited due process rights an inmate has pursuant to the Due Process Clause of the Fourteenth Amendment.

Counsel are directed to appear on May 11, 1998 at 11:00 a.m. to establish a day certain trial date.

IT IS SO ORDERED.